# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Warren K. Urbom | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 2102 | **DATE** | 4/29/2002 |
| **CASE TITLE** | McKay vs. Town & Country Cadillac,etal | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum and Order: Defendant's motion for summary judgment (128-1) is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | Document Number |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | APR 30 2002 | | |
| | Docketing to mail notices. | | date docketed | | 190 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 4/29/2002 | | |
| GL | courtroom deputy's initials | | date mailed notice GL | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

A. ROBERT McKAY,

**DOCKETED**

    Plaintiff,

APR 3 0 2002

vs.

TOWN AND COUNTRY CADILLAC,
INC. and MAX COHEN,

    Defendants

)
)
)
)
)
)
)
)
)
)
)

97 C 2102

MEMORANDUM AND ORDER ON
DEFENDANT TOWN & COUNTRY
CADILLAC INC'S MOTION FOR
SUMMARY JUDGMENT ON
PLAINTIFF'S RETALIATION CLAIM

       Before me is a motion for summary judgment filed by the defendant, Town & Country
Cadillac, Inc., directed at the plaintiff's claim that he experienced retaliation in violation of the
Americans with Disabilities Act. (Filing 128.) For the following reasons, this motion shall be
granted in part.

## I. BACKGROUND[1]

       The defendant, Town & Country Cadillac, Inc., is an automobile dealership doing
business in Naperville, Illinois. On June 17, 1995, the defendant hired the plaintiff, A. Robert
McKay, as its "New Car Sales and Lease Manager." (Def.'s Statement of Material Facts, filing
130, ¶ 5.) During the plaintiff's employment at Town & Country Cadillac, Ken Bacigalupo was
the defendant's "General Manager" and the plaintiff's immediate supervisor (id. ¶ 6), and Max
Cohen was the defendant's president.

       On the plaintiff's first day of work, his responsibilities as New Car Sales and Lease
Manager were explained to him by Mr. Bacigalupo. Those responsibilities initially included
logging and working on each new car "deal," taking over new car deals from other salespeople
when needed, following up with salespeople on deals that did not culminate in sales, returning

---

     [1]The background facts presented herein are taken from the parties' statements of material
facts that have been submitted in accordance with Local Rule 56.1, unless otherwise specified.
Of course, the parties' responses to one another's statements of facts, which also have been
submitted pursuant to Local Rule 56.1, have been taken into account as I have assembled this
summary of facts. In addition, I have considered my memoranda and orders resolving the several
motions to strike that have been filed by the parties in order to determine whether the parties'
statements of facts are supported by evidentiary materials as required by Local Rule 56.1. The
evidence is presented here in the light most favorable to the plaintiff. Adickes v. S. H. Kress &
Co., 398 U.S. 144, 157 (1970).

1



calls to customers, training salespeople, backing up the Finance & Insurance Department, and doing some paperwork on "lease deals." In his deposition, the plaintiff added that his job duties as new car sales manager entailed supervising and motivating salespeople, selling as many cars as possible, setting an example, and completing assigned paperwork in a timely fashion. (See Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 157:23-159:11.) He also stated that he was relieved of responsibility for lease paperwork at some point during his employment. (See id. at 158:15-17.)

The plaintiff's pay was based upon a salary and a draw. The draw was an advance against anticipated commissions, while salary was paid for "simply . . . showing up to work." (See Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 161:21-24.) The plaintiff was also given the use of an insured demonstration vehicle. (See id. at 94:18-23.) There is evidence that all managers and salespeople employed by the defendant received late-model demonstration vehicles, and that demonstration vehicles are a significant perquisite in the auto industry.

The plaintiff was absent from work on May 31 and June 1, 1996. On June 3, 1996, the plaintiff returned to work and informed Bacigalupo that he was an alcoholic. (Pl.'s Addendum of Exhibits, filing 148, Ex H., Bacigalupo Aff. ¶ 10). Prior to June 3, the defendant had no knowledge of the plaintiff's problem with alcohol, and there is no evidence that the plaintiff's alcoholism affected his job performance at any time. During their June 3 meeting, the plaintiff told Bacigalupo that he had a drinking problem, but that he had stopped drinking and that he was seeking help at Alcoholics Anonymous. Bacigalupo relayed this information to Cohen, who asked to speak to the plaintiff. The plaintiff then met with Cohen and stated that he had a problem with alcohol and that he "was going to do something about it." (See Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 192:1-4.) Following the plaintiff's revelation, Cohen became very upset with the plaintiff, "ranted and raved," made disparaging comments to the plaintiff,[2] and told the plaintiff that he would lose his demonstration vehicle. The plaintiff asked that his car not be taken from him and that Cohen be understanding of the plaintiff's alcohol problem. However, after his meeting with the plaintiff, Cohen ordered Bacigalupo to take the plaintiff's demonstration car away. In addition, an internal memorandum or "speed letter" dated June 4, 1996, indicates that the plaintiff's pay was to be docked for his absences on May 31 and June 1 at the direction of Mr. Cohen. Cohen claims that this deduction in pay was justified because the plaintiff did not call to notify the dealership that he would not be coming to work on those days. However, there is evidence that the plaintiff did in fact call in to the dealership to inform the office that he would be absent.

The June 4 "speed letter" also states that the plaintiff's pay was to be docked by $230.51

---

[2]There is evidence that Cohen yelled at the plaintiff, told him that his demonstration car would be taken from him because "you just told me that you're a fucking drunk," and called the plaintiff a "drug addict." (Pl.'s Addendum of Exhibits, filing 148, Ex A., McKay Dep. at 192:7-15.)

for personal telephone calls made by the plaintiff from November 1995 through April 1996.[3] It is undisputed that the plaintiff made 45 personal telephone calls in November 1995; 270 personal calls in December 1995; 292 personal calls in January 1996; 242 personal calls in February 1996; 257 personal calls in March 1996; 282 personal calls in April 1996; and 271 personal calls in May 1996. Michele Shultze, office manager at Town & Country, brought the calls to Cohen's attention after she viewed the telephone bill for April 1996. Cohen spoke with the plaintiff about the calls and learned that the calls were related to problems the plaintiff was having with his girlfriend. (See Def.'s Addendum of Exhibits, filing 49, Ex. A, Cohen Dep. at 234:1-14.) There is evidence that both Cohen and Bacigalupo instructed the plaintiff to stop making such calls. (Def.'s Addendum of Exhibits, filing 49, Ex. A, Cohen Dep. at 235:12-236:2; id. at Ex. C, Bacigalupo Dep. at 224:13-225:11). However, the plaintiff claims that the calls were not brought to his attention until he discovered the deduction on the first paycheck he received after he revealed his alcoholism to Cohen in June 1996. (See Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 207:21-208:5.)

On June 13, 1996, Cohen hired Frank Laskaris as Vice President. Prior to that date, however, Laskaris had been working with the defendant as a consultant. The parties dispute the extent of Laskaris's role and authority at Town & Country during the relevant time period. There is evidence that Cohen and Laskaris each had some authority over operations at Town & Country after June 13, 1996, and there is evidence that both individuals were involved in various employment actions that affected the plaintiff. When the plaintiff received his paycheck reflecting the deductions for absences and personal phone calls, he complained to Bacigalupo and Laskaris about those deductions. The plaintiff also spoke to Laskaris about the loss of his demonstration vehicle, and Laskaris offered to pay the plaintiff $100 per week in lieu of a demonstrator. However, there is evidence that this offer was not put into effect prior to the plaintiff's termination on June 26, 1996.

The plaintiff has also alleged that his pay plan was retroactively altered following his June 3 disclosure to Cohen. It is undisputed that prior to June 3, the plaintiff received a reconciliation sheet indicating that he owed a negative balance on his draw. It is also undisputed that prior to the plaintiff's disclosure on June 3, Cohen forgave the plaintiff's negative balance, and at no time did the defendant collect this negative balance from the plaintiff.

Although the plaintiff admits that he had no conversations with Cohen following their June 3 meeting, he claims that he attempted to talk to Cohen about the actions being taken against him on at least two occasions, but was unsuccessful. (See Pl.'s Addendum of Exhibits, filing 148, Ex. B, McKay Aff. ¶¶ 45-50.)

---

[3]Although the "speed letter" indicates that the deduction was to be based on personal calls made by the plaintiff from work between November 1995 and April 1996, another exhibit indicates that the deduction included calls placed in May 1996. (Compare Pl.'s Addendum of Exhibits, filing 59, Ex. 7 with Pl.'s Addendum of Exhibits, filing 148, Ex N.)

On June 26, 1996, Laskaris terminated the plaintiff's employment at Town & Country Cadillac. As a result, the plaintiff filed a complaint against Town & Country Cadillac, Inc. and Max Cohen, filing 1, alleging a violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. § 621 et seq. (West 1999) (Count I); a violation of the Americans with Disabilities Act (ADA), 42 U.S.C.A. § 12101 et seq. (West 1995) (Count II); a state law claim for the intentional infliction of emotional distress (Count III); and a state law claim for defamation (Count IV). As a result of Town & Country's and Cohen's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (filing 5), Count III was dismissed in its entirety and Cohen was dismissed from Counts I and II. (See filing 13; McKay v. Town & Country Cadillac, Inc., 991 F. Supp. 966, 973 (N.D. Ill. 1997).) Also, Count I of the complaint was eventually voluntarily dismissed in its entirety pursuant to a joint motion filed by the parties. (See filings 103 and 104.) Defendant Town & Country Cadillac moved for summary judgment on Count II of the complaint. (See filing 46.) This motion was granted because the evidentiary materials before me demonstrated that there was no genuine issue whether the plaintiff was disabled within the meaning of the ADA, and that the defendant was therefore entitled to judgment as a matter of law. (See generally Mem. and Order on Def. Town & Country Cadillac's Mot. for Summ. J., filing 99.) However, it was subsequently determined that the defendant's motion failed to address the plaintiff's claim of retaliation in violation of the ADA, which was included within Count II of the complaint. (See generally Mem. and Order on Pl.'s Mot. to Amend J., filing 125.) I therefore decided to allow the defendant to move for summary judgment on the plaintiff's retaliation claim, and, of course, the plaintiff was provided with an opportunity to respond to the defendant's motion. (See id.) This motion, entitled "Town & Country Cadillac, Inc.'s Motion for Summary Judgment on Plaintiff's Retaliation Claim," filing 128, is now ready to be resolved. I find that the defendant's motion must be granted in part.

## II.   STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court when, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is sufficient evidence favoring the party opposing the motion for a reasonable jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the opposing party to produce evidentiary materials demonstrating the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); FED. R. CIV. P. 56(e). The opposing party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial" and "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 256-57.

### III. ANALYSIS

The ADA has been designed for the purpose of eliminating discrimination against individuals with disabilities. See 42 U.S.C.A. § 12101(b) (West 1995); Talanda v. KFC National Management Co., 140 F.3d 1090, 1095 (7th Cir. 1998). Among the protections it affords is its prohibition against retaliation:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C.A. § 12203(a) (West 1995). Prior to February 19, 2002, a plaintiff attempting to establish a prima facie case of retaliation in this circuit was required to satisfy the following test:

> An employee demonstrating a prima facie case of retaliation under the ADA, as under Title VII, "must establish that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action." Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1459 (7th Cir.1995) (citing cases). If the employee is successful at that level, to prevail ultimately he "must also rebut the defendants' nondiscriminatory reasons for the adverse action and establish that a discriminatory motive was the determining factor behind the defendants' action." Id.

Talanda v. KFC National Management Co., 140 F.3d 1090, 1095-96 (7th Cir. 1998). The defendant has argued that the plaintiff is unable to satisfy any of these three requirements for a prima facie case of retaliation in violation of the ADA. However, after the present motion was fully briefed, the Seventh Circuit created "a new rule for the adjudication of retaliation cases." Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 644 (7th Cir. 2002). Under the new rule, two methods for analyzing retaliation claims are specified. See id. First, a plaintiff may "present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he [1] engaged in protected activity . . . and [2] as a result [3] suffered the adverse employment action of which he complains." Id. (numbering added). If the plaintiff succeeds in this showing, the defendant may yet prevail on its motion for summary judgment if it "presents unrebutted evidence that [it] would have taken the adverse employment action against the plaintiff even if [it] had had no retaliatory motive." Id. The second method of analyzing retaliation claims is based upon "the adaptation of McDonnell Douglas to the retaliation context." Id. Here, the plaintiff must "show that [1] after filing the charge [2] only he, and not any similarly situated employee who did not file a charge, [3] was subject to an adverse employment action [4] even though he was performing his job in a satisfactory manner." Id. (numbering added). If the plaintiff succeeds in this showing, the defendant may still be

entitled to summary judgment if it "presents unrebutted evidence of a noninvidious reason for the adverse action." Id.

Since the parties' arguments are presented under the Talanda framework for analyzing retaliation cases, it might seem at first impression that adapting their arguments to the Stone framework would resemble the inelegant and proverbial pounding of a square peg into a round hole. However, I note that the defendant's argument that the plaintiff did not engage in a protected expression would, if successful, entitle the defendant to summary judgment under either the "direct evidence" or "McDonnell Douglas" analyses presented in Stone. Compare Talanda v. KFC National Management Co., 140 F.3d at 1095 ("[an employee] must establish that (1) he engaged in statutorily protected expression . . . .") with Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644 ("[a plaintiff may] present direct evidence . . . that he engaged in protected activity . . . .") and id. ("the adaptation of McDonnell Douglas to the retaliation context . . . requires the plaintiff to show that *after filing the charge* . . . .") (emphasis added). The defendant has also argued that the plaintiff suffered no adverse employment action and that the plaintiff is unable to show that the defendant's nondiscriminatory reasons for any employment action were pretextual. Again, if the defendant were to prevail on either of these arguments, the defendant would be entitled to summary judgment under either analytical framework set forth in Stone. Compare Talanda v. KFC National Management Co., 140 F.3d at 1095-1096 with Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644. The defendant's argument that the plaintiff cannot demonstrate a causal link between a protected expression and an adverse employment action is now irrelevant under the "McDonnell Douglas" analysis of retaliation claims. See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 643-44 (clarifying that a plaintiff proceeding under McDonnell Douglas need not show any causal link between a protected expression and an adverse employment action). However, this argument may be relevant under the "direct evidence" analysis. See id. Each of the defendant's specific arguments in support of its motion for summary judgment will now be translated into the proper legal framework and addressed in sequence.

A. **Whether the Plaintiff Engaged in Statutorily Protected Expression**

In order to prevail on a claim of retaliation in violation of the ADA, a plaintiff must show that he "engaged in statutorily protected activity." Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002)[4] (citing Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640 (7th Cir. 2002)). See also Talanda v. KFC National Management Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1459 (7th Cir.1995)). This means that the plaintiff "must have acted 'in good faith and with a reasonable and sincere belief that he . . . is opposing unlawful discrimination.'" Talanda v. KFC National Management Co., 140 F.3d at 1096 (quoting Roth v. Lutheran Gen. Hosp., 57 F.3d at 1459 (7th Cir.1995) (emphasis

--------

[4]Although Hilt-Dyson is a Title VII case, retaliation claims under Title VII and the ADA are "quite comparable." Talanda v. KFC National Management Co., 140 F.3d 1090, 1095 (7th Cir. 1998).

omitted)). The defendant contends that the plaintiff is unable to show that he opposed unlawful discrimination because: 1) it has already been determined that the plaintiff is not disabled within the meaning of the ADA; and 2) the plaintiff never told the defendant that he believed the defendant's actions violated the ADA.

1.    <u>Whether the Previous Finding That the Plaintiff Is Not Disabled Automatically Destroys the Plaintiff's Retaliation Claim.</u>

The defendant argues first that because the plaintiff is not disabled, the defendant could not have violated the ADA. According to the defendant's reasoning, since the defendant could not have violated the ADA, the plaintiff could not have opposed any act performed by the defendant in violation of the ADA. (<u>See</u> Def. Town & Country Cadillac Inc.'s Mem. in Supp. of its Mot. for Summ. J. on Pl.'s Retaliation Claim [hereinafter "Def.'s Br."], filing 129, at 4-5.) Put more simply, the defendant argues that since it has been determined that the plaintiff is not disabled within the meaning of the ADA, the plaintiff's retaliation claim fails as a matter of course. As I have noted above in the background discussion, it is true that it has already been determined that the plaintiff is not disabled within the meaning of the ADA. (<u>See generally</u> Mem. and Order on Def. Town & Country Cadillac's Mot. for Summ. J., filing 99.) However, in a retaliation case "it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry." <u>Talanda v. KFC National Management Co.</u>, 140 F.3d at 1096 (quoting <u>Rucker v. Higher Educ. Aids Bd.</u>, 669 F.2d 1179, 1182 (7th Cir. 1982)). This means that the plaintiff need not show that he was in fact disabled within the meaning of the ADA, but instead must show that he reasonably and sincerely believed in good faith that he was disabled. <u>See Talanda v. KFC National Management Co.</u>, 140 F.3d at 1096-97 ("Mr. Talanda therefore must show that he *reasonably believed* that Bellson was, or was perceived by KFC as, [substantially limited in the major life activity of working]." (emphasis added)). In other words, even though it has been established that the plaintiff was not disabled within the meaning of the ADA, the plaintiff's retaliation claim may yet survive.

The defendant disagrees with this conclusion. Citing <u>Talanda</u> and <u>Hamner v. St. Vincent Hospital and Health Care Center</u>, 224 F.3d 701, 707 (7th Cir. 2000), the defendant argues that when a plaintiff opposes conduct not proscribed by the ADA, the plaintiff's belief that he opposed an unlawful practice, though sincere, cannot be objectively reasonable. The defendant is quite correct that a plaintiff claiming retaliation must have an objectively reasonable belief that he or she opposed an unlawful practice. <u>See Hamner v. St. Vincent Hospital and Health Care Center</u>, 224 F.3d at 707. However, the defendant's argument fails because in this case, the plaintiff has opposed conduct that is proscribed by the ADA.

<u>Hamner</u> does not support the defendant's contention that the plaintiff's claim for retaliation cannot lie because he has been shown not to be disabled. In <u>Hamner</u>, the Seventh Circuit noted that "[t]he plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, *which means that the complaint must involve discrimination that is prohibited by Title VII.*" <u>Hamner v. St.</u>

Vincent Hospital and Health Care Center, 224 F.3d at 707 (emphasis added). Hamner's complaint alleged harassment based upon his homosexuality. See id. at 706, 707. The court noted that "[s]exual orientation is not a classification that is protected under Title VII; thus homosexuals are not members of a protected class under the law." Id. at 707. Since Hamner's complaint did not place him within a protected class, "no reasonable jury could find that Hamner reasonably believed that his grievance was directed at an unlawful employment practice under Title VII." Id. Here, however, McKay's complaint clearly "involve[s] discrimination that is prohibited by the [ADA]." Id. The plaintiff claims to be disabled, and this claim places him quite conspicuously within the ambit of the ADA, even if it was ultimately shown that the plaintiff was not disabled at any relevant time. Thus, this case differs from one in which a plaintiff's claim is based on a classification that is simply not protected under the law he relies upon. See Hamner v. St. Vincent Hospital and Health Care Center, 224 F.3d at 706-708 ("In conclusion, Hamner's retaliation claim fails as a matter of law because the conduct that he opposed (harassment because of his sexual orientation) is not, under any circumstances, proscribed by Title VII . . . .").

The defendant argues that in Talanda, the plaintiff claimed that he was terminated for opposing discrimination against a subordinate in violation of the ADA, but that after the court determined that the subordinate was not disabled within the meaning of the ADA, the plaintiff's retaliation claim failed. See Talanda v. KFC National Management Co., 140 F.3d at 1097-98. However, it seems to me that the defendant's argument misreads and oversimplifies the court's analysis in Talanda. In Talanda, the Seventh Circuit's determination that the plaintiff's retaliation claim failed was not based upon the fact that the subordinate was not disabled, but was based instead upon the court's conclusion that the plaintiff could not show that he *reasonably believed* that the subordinate was disabled or that he *reasonably believed* that KFC regarded and treated the subordinate as disabled under the ADA. See id. at 1096-98. In fact, the court noted that "Mr. Talanda has offered no evidence from which he reasonably might have inferred that Bellson's missing teeth precluded her from holding other comparable positions. . . . Under these circumstances, Mr. Talanda ought to have realized that Bellson's missing teeth did not limit her in the performance of a major life activity." Id. at 1097. Talanda does not stand for the proposition that a plaintiff cannot bring a retaliation claim once it is determined that he or she is not disabled within the meaning of the ADA. See id. at 1096-98. On the contrary, Talanda teaches that in a retaliation case "it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry." Talanda v. KFC National Management Co., 140 F.3d at 1096 (quoting Rucker v. Higher Educ. Aids Bd., 669 F.2d 1179, 1182 (7th Cir. 1982)).

The defendant's argument that the plaintiff's inability to demonstrate that he was disabled defeats the retaliation claim is predicated upon the following assumption:

> It follows, and is in fact well settled, that if Plaintiff is not disabled under the ADA, then no matter how egregious Defendant's conduct, Defendant cannot act unlawfully under the ADA. Skorup v. Modern Door [C]o[rp]., 153 F.3d 512, 514-[]15 (7th Cir. 1998). Thus, Plaintiff can not [sic] claim to have opposed an

unlawful act under the ADA, when Defendant could not have possibly engaged in unlawful acts under the ADA *vis a vis* Plaintiff.

(Def.'s Br. at 4-5.) In other words, the defendant claims that because it could not have discriminated against the plaintiff (due to the fact that the plaintiff is not disabled), the plaintiff cannot maintain a retaliation claim against the defendant. It is true that in order to set forth a claim of *discrimination* in violation of the ADA, a plaintiff must show that he or she is disabled. See Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998). Indeed, it is because the plaintiff failed to show that he was disabled that the defendant's original motion for summary judgment on the plaintiff's ADA claims was granted. (See generally Mem. and Order on Def. Town & Country Cadillac's Mot. for Summ. J., filing 99.) However, the defendant's suggestion that the plaintiff cannot maintain a retaliation claim against the defendant without showing that the defendant discriminated against the plaintiff is clearly incorrect. See Talanda v. KFC National Management Co., 140 F.3d at 1096 ("it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry." (quoting Rucker v. Higher Educ. Aids Bd., 669 F.2d 1179, 1182 (7th Cir. 1982))).

Based upon the foregoing analysis, I find I must reject the defendant's argument that the plaintiff could not have opposed unlawful discrimination simply because he was not disabled. In passing, I note this is the defendant's only argument that the plaintiff did not act "in good faith and with a reasonable and sincere belief that he . . . is opposing unlawful discrimination.'" Talanda v. KFC National Management Co., 140 F.3d at 1096 (quoting Roth v. Lutheran Gen. Hosp., 57 F.3d at 1459 (7th Cir.1995) (emphasis omitted)). (See Town & Country Cadillac Inc.'s Motion for Summary Judgment on Plaintiff's Retaliation Claim, filing 128, at 1 ("Plaintiff did not oppose unlawful conduct under the ADA because Defendant did not and could not act unlawfully in that Plaintiff was not disabled under the ADA based on the Court's Ruling [sic] of April 21, 2000." (citing Hamner, 224 F.3d at 707; and Talanda, 140 F.3d at 1097-98)). See also Def.'s Br. at 3-9.) Perhaps motivated by an over-abundance of cautiousness, the plaintiff has submitted a substantial amount of evidentiary material to demonstrate the nature of his alcohol problem (see, e.g., Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶¶ 4-86), and much of this evidence would seem relevant to the question of whether the plaintiff reasonably believed that he was disabled at the relevant time. However, before the plaintiff engages in his review of this evidence, he argues that he "should not . . . have to present any . . . evidence on this issue" because the defendant has only argued that the plaintiff could not have opposed unlawful discrimination due to the fact that he was not disabled. (Pl.'s Response to Def.'s Mot. for Summ. J. on Pl.'s Retaliation Claim [hereinafter "Pl.'s Br."], filing 147, at 10.) The plaintiff then states, "Should the Court disagree, Plaintiff would present the following evidence on the objective reasonableness of Plaintiff's belief." (Id.)

The defendant has argued only that the plaintiff's retaliation claim must fail because the plaintiff is not disabled, and I have rejected this argument. Since the defendant has made no other argument that the plaintiff did not act "in good faith and with a reasonable and sincere belief that he . . . is opposing unlawful discrimination,'" Talanda v. KFC National Management

Co., 140 F.3d at 1096 (quoting <u>Roth v. Lutheran Gen. Hosp.</u>, 57 F.3d at 1459 (7th Cir.1995)) (emphasis omitted),[5] it cannot claim that the burden of demonstrating the existence of a genuine issue for trial on that question has been shifted to the plaintiff. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986); FED. R. CIV. P. 56(e). In short, I agree with the plaintiff that for the purposes of this motion, he is not required to set forth further evidence or argument on the question of whether he acted in good faith and with a reasonable and sincere belief that he was opposing unlawful discrimination. Therefore, the plaintiff's arguments set forth on pages 8-15 of his response brief, which in a sense respond to an argument that the defendant *never raised* in its memorandum in support of its motion for summary judgment, need not be considered.

2.  <u>Whether the Plaintiff Ever Told the Defendant That He Believed the Defendant's Actions Violated the ADA.</u>

    The defendant next argues that the plaintiff cannot show that he engaged in a protected expression because the plaintiff cannot "demonstrate that he actually opposed actions taken against him as being unlawful under the ADA." (Def.'s Br. at 7.)

    For the purposes of an ADA retaliation claim, statutorily protected expressions generally

---

[5]In Town & Country Cadillac Inc.'s Reply in Support of Its Motion for Summary Judgment on Plaintiff's Retaliation Claim [hereinafter "Def.'s Reply Br."], filing 155, the defendant argues for the first time that "there is no testimony from Plaintiff that he believed himself to be disabled during the relevant period of inquiry." (Def.'s Reply Br. at 7. <u>See also id.</u> at 8-12.) I find it likely that the defendant's new argument was inspired by the plaintiff's "overly cautious" response, wherein the plaintiff anticipates such an argument. (<u>See</u> Pl.'s Br. at 10-15.) It is generally not appropriate to consider new arguments that are raised for the first time in a reply brief. <u>See, e.g.</u>, <u>Marie O. v. Edgar</u>, 131 F.3d 610, 614 n.7 (7th Cir. 1997); <u>United States v. Magana</u>, 118 F.3d 1173, 1198 n.15 (7th Cir. 1997); <u>Wilson v. Giesen</u>, 956 F.2d 738, 741 (7th Cir. 1992); <u>Kastel v. Winnetka Board of Education</u>, 946 F. Supp. 1329, 1335 (N.D. Ill. 1996). I recognize that, strictly speaking, the argument was first raised by the plaintiff in his response brief, and therefore it was not raised "for the first time" in the defendant's reply brief. However, the plaintiff meant for its argument to be considered only if I interpreted the defendant's original brief to demand such a response. Under the circumstances, considering this argument would be tantamount to requiring the plaintiff to anticipate and respond to arguments that were not made in the original motion for summary judgment. In addition, I note that the defendant has engaged repeatedly in the strategy of ambushing the plaintiff with arguments raised for the first time in its reply briefs. (<u>See, e.g.</u>, Town & Country's Reply in Support of Its Mot. for Summ. J. at 32-35 (arguing for the first time that summary judgment should be granted on the plaintiff's retaliation and harassment claims); Def. Town & Country Cadillac, Inc's Reply in Supp. of Its Mot. to Strike the Second Aff. of A. Robert McKay at 11-12; Def.'s Reply to Pl.'s Response to Def.'s Mot. to Strike Ex. P & Q at 3-4.) The fact that the plaintiff did effectively anticipate the defendant's argument on this occasion does not render the defendant's practice appropriate. The defendant's argument shall not be considered by me.

consist of either: 1) an employee's filing of an EEOC charge or participating in an investigation, proceeding, or hearing under the ADA; or 2) an employee's opposition to "any act or practice" that is unlawful under the ADA. See 42 U.S.C.A. § 12203(a) (West 1995); Talanda v. KFC National Management Co., 140 F.3d at 1096. In this case, it is undisputed that the plaintiff was not retaliated against for filing a charge or participating in an investigation, proceeding, or hearing under the ADA. It must now be determined if there is a genuine issue for trial whether the plaintiff actually "opposed any act or practice made unlawful" by the ADA. 42 U.S.C.A. § 12203(a) (West 1995).

In some jurisdictions, the plaintiff's opposition "may take the form of informal protests (e.g., complaints to management) of discriminatory employment practices." Equal Employment Opportunity Commission v. A. Sam & Sons Produce Company, Inc., 872 F. Supp. 29, 37 (W.D.N.Y. 1994). The Seventh Circuit has yet to rule whether informal complaints of discrimination constitute protected expression. See Krause v. City of La Crosse, 246 F.3d 995, 1000 (7th Cir. 2001). Since the parties have presented no argument on this point, I shall assume for the purposes of this motion that informal complaints can, in general, amount to "protected expression" for the purposes of a retaliation claim under the ADA.

As I have noted above, opposition to unlawful, discriminatory employment practices is protected as long as the opposing employee "acted in good faith and with a reasonable and sincere belief that he or she is opposing unlawful discrimination." Talanda v. KFC National Management Co., 140 F.3d at 1096 (quoting Roth v. Lutheran Gen. Hosp., 57 F.3d at 1459 (7th Cir.1995)) (emphasis omitted)  Here, however, the argument presented by the defendant is not whether the plaintiff reasonably believed that he opposed a discriminatory employment practice, but whether the plaintiff "reasonably communicate[d] his opposition to actions he believed to be in violation of the ADA." (Def.'s Br. at 9.) Guidance on this question is relatively difficult to find.  In Gleason v. Mesirow Financial, Inc., 118 F.3d 1134 (7th Cir. 1997), the Seventh Circuit affirmed the district court's decision that the plaintiff failed to establish that she engaged in a protected expression. See Gleason v. Mesirow Financial, Inc., 118 F.3d at 1146-47. The court stated:

> Gleason fails to establish the first element of a prima facie case of retaliation (engaging in "protected expression") because she never reported her allegations of sexual harassment during her term of employment with the defendant-appellee. In order to demonstrate a case of retaliatory discharge, a plaintiff must show that she opposed conduct prohibited by Title VII, or at a minimum that she had a "reasonable belief" she was challenging such conduct. Dey [v. Colt Const. & Development Co.], 28 F.3d [1446] at 1458 [(7th Cir. 1994)]. Gleason and others did complain about Novak's management style, in general terms. However, Gleason concedes that she did not raise the subject of sexual harassment to anyone in authority (including Novak and McGowan), and she admits that she neglected to follow the company's procedures for reporting sexual harassment. Gleason claims in her deposition testimony that she "feels" that

11

Novak's objectionable behavior "encompassed ... sexual discrimination," but unless she made these "feelings" known to her employer, they are irrelevant. Based on this record, we hold that Gleason did not engage in statutorily-protected expression or activity prior to her termination and has thus failed to establish the "protected expression" element of retaliatory discharge.

Gleason v. Mesirow Financial, Inc., 118 F.3d at 1146-47 (emphasis omitted). The defendant also refers me to Drago v. Aetna Plywood, Inc., 968 F. Supp. 1251 (N.D. Ill. 1997), wherein the court concluded that the plaintiff failed to demonstrate that she engaged in statutorily protected expression by telling the defendant's chief executive officer that women in the office were afraid of him and reminding him that he once said to the plaintiff, "Are you afraid I'm going to rape you?" Drago v. Aetna Plywood, Inc., 968 F. Supp. at 1256. The court dismissed the plaintiff's retaliation claim and noted, "Telling him women in the office were fearful of his behavior is not telling him that he was committing sexual harassment or other behavior violative of Title VII. Mere reference to the rape statement also does not raise such issues."

While Gleason and Drago are illustrative of the sort of complaint that fails to rise to the level of a protected expression for the purposes of a plaintiff's retaliation claim, neither case sets forth a test or standard for determining whether a specific complaint adequately communicates to an employer that the employee is opposing unlawful discrimination. Such a standard may be found in Hamner v. Community Hospitals of Indiana, Inc., 92 F. Supp. 2d 803, 806-07 (S.D. Ind. 2000):

A basic requirement to establishing a prima facie case of retaliation is that the employer must be aware of the employee's statutorily protected expression before the adverse action is taken against the employee. See Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir. 1994). Although the Seventh Circuit has not addressed this issue, the Second Circuit has held that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [the statute]." Galdieri- Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 292 (2nd Cir. 1998). The court is persuaded that this is an appropriate requirement. Seventh Circuit case law teaches that employers are generally free to fire employees for any reason, or no reason, so long as the reason is not prohibited by statute. See, e.g., Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1035 (7th Cir. 1999) (citing Debs v. Northeastern Ill. Univ., 153 F.3d 390, 396 (7th Cir. 1998)). Therefore, if the employer did not, and reasonably could not have understood that the plaintiff's opposition was directed at conduct prohibited by the ADA, then an employer's discharge of the employee for such opposition should fall within the protective umbrella of that general rule that "an employer may fire an employee for any reason at all, as long as the reason does not violate a Congressional statute." Kahn v. Secretary of Labor, 64 F.3d 271, 280 (7th Cir.1995).

12

<u>Hamner v. Community Hospitals of Indiana, Inc.</u>, 92 F. Supp. 2d 803, 806-07 (S.D. Ind. 2000).

I appreciate that the analysis set forth above did not form the basis of the court's decision in <u>Hamner</u>, and that the case was ultimately disposed of on other grounds. <u>See id.</u> at 806-810 (granting summary judgment against plaintiff due to his failure to establish that he had a reasonable belief that his employer's action was unlawful). I also recognize that on appeal, the Seventh Circuit did not specifically address this portion of the court's decision. <u>See generally</u> <u>Hamner v. St. Vincent Hospital and Health Care Center</u>, 224 F.3d 701, 707 (7th Cir. 2000). In addition, I note that although the district court was analyzing the first element of the plaintiff's prima facie case (i.e., whether the plaintiff engaged in statutorily protected expression), the court based its analysis upon a principle that was originally set forth in an analysis of the now defunct–at least in the context of <u>McDonnell Douglas</u> styled claims–"causation" element. <u>Compare Hamner v. Community Hospitals of Indiana, Inc.</u>, 92 F. Supp. 2d at 806-07 (citing <u>Dey v. Colt Constr. & Dev. Co.</u>, 28 F.3d at 1458) <u>with Dey v. Colt Constr. & Dev. Co.</u>, 28 F.3d 1446, 1458 (7th Cir. 1994). <u>See also Stone v. City of Indianapolis Public Utilities Division</u>, 281 F.3d at 643-44. Despite these limitations, I find that the reasoning set forth in <u>Hamner</u> is sound and should be applied in the present case. Furthermore, I note that the court's reasoning on this issue is consistent with the analysis set forth in the Equal Employment Opportunity Commission (EEOC) Compliance Manual. Although EEOC guidelines are not binding authority, <u>see, e.g.</u>, <u>Soileau v. Guilford of Maine, Inc.</u>, 105 F.3d 12, 15 n.2 (1st Cir. 1997), both of the parties in this case have referred me to section 8-II of the EEOC New Compliance Manual, which states as follows:

> B.   PROTECTED ACTIVITY: OPPOSITION
> 1. Definition
>     The anti-retaliation provisions make it unlawful to discriminate against an individual because s/he has opposed any practice made unlawful under the employment discrimination statutes. This protection applies if an individual explicitly or implicitly communicates to his or her employer or other covered entity a belief that its activity constitutes a form of employment discrimination that is covered by any of the statutes enforced by the EEOC.
> . . . .
> 2. Examples of Opposition
> . . . .
> . . . Because individuals often may not know the specific requirements of the anti-discrimination laws enforced by the EEOC, they may make broad or ambiguous complaints of unfair treatment. Such a protest is protected opposition if the complaint would *reasonably have been interpreted* as opposition to employment discrimination.

EEOC New Compliance Manual § 8-II(B)(1)-(2) (emphasis added).

Using the standard set forth by the district court in <u>Hamner</u>, I shall now evaluate each of the instances of protected expression alleged by the plaintiff in order to determine whether the defendant understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by the ADA. <u>See Hamner v. Community Hospitals of Indiana, Inc.</u>, 92 F. Supp. 2d at 806-07.

The plaintiff argues that the following constituted his first protected expression: "Plaintiff's first complaint was to Defendant's president, Defendant [Cohen], while Plaintiff was disclosing his alcoholism, Cohen was negatively reacting, Plaintiff was protesting that was not fair and defending himself with additional facts showing he was getting help and not drinking and driving." (Pl.'s Br. at 19-20.) This statement might have been better phrased, but I take the plaintiff to mean that when he informed Cohen of his alcoholism on June 3, 1996, Cohen yelled at the plaintiff, told him that his demonstration car would be taken from him because "you just told me that you're a fucking drunk," and called the plaintiff a "drug addict." (Pl.'s Addendum of Exhibits, filing 148, Ex A., McKay Dep. at 192:7-15.) The plaintiff then claims that he protested the fairness of Cohen's response, and responded that he was getting help and was not driving under the influence of alcohol. First, I note that I fail to see how the plaintiff's initial statement to Cohen (announcing the existence of the plaintiff's alcoholism) could possibly amount to opposition of unlawful discrimination, given that the plaintiff has not argued that any act of discrimination occurred prior to the June 3 meeting. Indeed, the undisputed evidence shows that prior to that meeting, the defendant had no knowledge of the plaintiff's alcoholism.[6]

---

[6]Despite this evidence, the plaintiff has argued that his initial revelation of his alcoholism to Cohen constitutes a protected expression for the purposes of his retaliation claim. (<u>See</u> Pl.'s Br. at 21-23.) In sum, the plaintiff argues that "a person must reveal a disability to seek accommodation," that he revealed his alcoholism to Cohen in order to seek the accommodation of "understanding such as that he had received from a prior employer," and that the first step of the "accommodation process" is for McKay to reveal his disability. (<u>Id.</u> at 21-22.) In support of his argument, the plaintiff relies on <u>Beck v. University of Wisconsin Bd. of Regents</u>, 75 F.3d 1130, 1135 (7th Cir. 1996). In <u>Beck</u>, the plaintiff claimed that the defendant failed to accommodate reasonably her disability, and the court noted, "An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations . . . ." <u>Id.</u> at 1134. The plaintiff's attempt to characterize his complaint as one that encompasses a claim based on the defendant's failure to accommodate him is not well taken. The portion of the plaintiff's affidavit that describes the sort of "understanding" he received from a prior employer has been stricken. (<u>See</u> Mem. and Order on Def.'s Mot. to Strike the Second Aff. of McKay at 9-10.) More importantly, the plaintiff has simply not raised a "failure to accommodate" claim similar to the one at issue in <u>Beck</u>. The issue in this case is whether the plaintiff opposed conduct made unlawful by the ADA, not whether the defendant's liability under the ADA has been triggered for failure to provide accommodations. I therefore reject the plaintiff's argument that under <u>Beck</u>, his announcement of his alleged disability to Cohen was a protected expression for the purposes of his retaliation claim.

Therefore, I turn to the plaintiff's argument that his response to Cohen's negative reaction to the plaintiff's announcement constituted opposition to unlawful discrimination. The plaintiff describes his response to Cohen's outburst as follows:

> Mr. McKay asked Mr. Cohen not to take his demonstration car away, and Mr. Cohen said "what would you do" and Mr. McKay said "I wouldn't take someone's car away if they were trying to get help." (Ex. A, McKay dep., p. 192, ln. 7-24; Ex. B, McKay Aff. II, ¶ 55).

(Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶ 97.) The plaintiff then attempts to argue that the reason he made this statement to Cohen was because he was upset and because "he considered this a complaint about the threat to point out that it was wrong to take the vehicle because he revealed his alcoholism and was seeking help and understanding." (Id. ¶ 101. See also id. ¶¶ 98-102.) I disregard these arguments because absent any evidence that he "made these 'feelings' known to his employer, they are irrelevant." Gleason v. Mesirow Financial, Inc., 118 F.3d at 1147. Instead, it must be determined whether the defendant understood, or could reasonably have understood, that the plaintiff's request that Cohen not take his demonstration car away and the plaintiff's statement that "I wouldn't take someone's car away if they were trying to get help" were statements of opposition directed at conduct prohibited by the ADA.

It seems to me that there is a genuine issue whether the defendant could reasonably have understood the plaintiff's opposition to be directed at conduct prohibited by the ADA. There is evidence that after the plaintiff asked why his car was to be taken, Cohen replied, "you just told me you are a fucking drunk." (Pl.'s Addendum of Exhibits, filing 148, Ex A., McKay Dep. at 192:8-11.) It was then that the plaintiff asked that his car not be taken and stated that he "wouldn't take someone's car away if they were trying to get help." (Id. at 192:21-24.) If this case were based upon race rather than disability, and if the word "drunk" in Cohen's statement to McKay were replaced with a pejorative racial slur, it would be difficult indeed to argue that McKay's subsequent protest against the loss of his car did not amount to opposition to unlawful conduct. In this case, ambiguity is introduced due to the fact that under current law, there are no "per se" disabilities, Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999) (finding that whether a person has a disability under the ADA is an individualized inquiry), and because it has already been determined that the plaintiff's alcoholism did not amount to a disability for the purposes of the ADA during a time when the plaintiff was abstaining from alcohol use. (See generally Mem. and Order on Def. Town & Country Cadillac's Mot. for Summ. J., filing 99.) However, it must be recalled that the plaintiff does not have to be correct in his belief that he is opposing unlawful discrimination in order for his retaliation claim to remain viable. See Talanda v. KFC National Management Co., 140 F.3d at 1096. Under the circumstances, the defendant's argument that the plaintiff never opposed conduct made unlawful by the ADA must be rejected.

It is undisputed that after the June 3 meeting between the plaintiff and Cohen, the two

never spoke to one another again.[7] (See supra Part I.) Therefore, if the plaintiff engaged in any other protected expressions for the purposes of his retaliation claim, those expressions would have been made to someone other than Cohen. The plaintiff argues that after he received his paycheck for the week of June 1, 1996, which reflected a deduction in his pay for absences on May 31 and June 1 and for personal phone calls, he objected to Ken Bacigalupo and Frank Laskaris about the deductions. (See Pl.'s Br. at 24; Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶ 134.) In addition, the plaintiff claims that he "attempted to, but was not given the opportunity in his deposition to explain the nature of [his] objection," and that "[t]he nature of [his] objection was that this happened because of what [he] had told Max (about [his] alcoholism), defended [himself] when he yelled . . . , and complained about the car being taken away." (See Pl.'s Br. at 24; Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶ 135; Pl.'s Addendum of Exhibits, filing 148, Ex. B, McKay Aff. ¶¶ 66, 68.) However, I have stricken the evidence upon which these claims are based because that evidence contradicts the plaintiff's previous deposition testimony. (See Mem. and Order on Def.'s Mot. to Strike the Second Aff. of McKay at 18-21 (striking paragraphs 66 and 68 of McKay's second affidavit).) In his deposition, the plaintiff testified as follows:

> Q: What was the – why did you object?
> A: Because while I had made the calls, I never seen anyone get docked for making calls before and no one had ever told me that I couldn't use the phone for personal calls before and no one had ever told me that they had to be limited. I was there for, you know, eleven hours a day.

(Pl.'s Addendum of Exhibits, filing 148, Ex. A, McKay Dep. at 209:7-13. See also id. at 208:1-209:13.) Even if it is assumed that the nature of the plaintiff's objection was communicated to Bacigalupo or Laskaris, I find that the defendant could not reasonably have understood this objection to be opposition directed at conduct prohibited by the ADA. Nor has the plaintiff directed me to any other evidence showing that he made complaints to Bacigalupo or Laskaris concerning the deductions from his paycheck that could reasonably be understood as opposition to conduct prohibited by the ADA. Thus, I reject the plaintiff's assertion that his objections to Ken Bacigalupo and Frank Laskaris about the deductions to his "June 1" paycheck amounted to protected expressions for the purposes of his retaliation claim.

Finally, the plaintiff argues that he "made complaints to Mr. [Laskaris] . . . about the car being taken away which connected that action to his alcoholism and Mr. Cohen's reaction." (Pl.'s Br. at 24-25.) These complaints were allegedly made in two conversations. In one of these conversations, Laskaris came to the plaintiff's office and said, "You are really on thin ice with Max [Cohen]. He is pissed." (Pl.'s Addendum of Exhibits, filing 148, Ex. A, McKay Dep. at 124:17-19.) The plaintiff testified as follows:

---

[7] There is evidence that the plaintiff *attempted* to speak with Cohen on two other occasions. (See supra Part I.)

Q: What did you say, if anything, in that conversation?

A: I complained to him about my car being taken away and he told me he was going to work on that, give him some time.

Q: Okay. Anything else?

A: I complained about the way Max was treating me.

Q: In particular, what were you complaining about?

A: Max was very cold to me. He used to call just about every night and most of the time he would ask to speak with me, and after that point on he would ask to speak with anyone but me.

. . . .

A: He was giving me the cold shoulder.

Q: Again I just want to confirm this. It wasn't what he was saying. It's because he wasn't talking to you?

A: It wasn't anything that he said to me.

. . . .

Q: What else now? This conversation, I want to exhaust this, everything that was said in "You are on thin ice conversation"?

A: He told me, "Don't worry," he said, "let me work on it," [a]nd I took from that to mean that he was going to work on getting me my car back, and he had also said, "but you got to start selling more cars." I said, "What do you mean more cars? I want to please you guys. What is it that you wants?" "Well you got to sell more cars."

Q: What else was said by the both of you? Did you agree to that?

A: I frankly told him that I was selling as many as I can. I felt I was being in a position that I was not able to please them.

Q: Did you give him any affirmation that you would sell more cars?

A: I probably told them, and I am dealing with my recollection, that I would try.

Q: What else, if anything, was said by the two of you in that you-were-on-thin-ice conversation?

A: I don't recall anything else.

(Pl.'s Addendum of Exhibits, filing 148, Ex. A, McKay Dep. at 124:24-127:1.) Although the evidence shows that the plaintiff complained about his car being taken away, no statement by the plaintiff during this conversation can reasonably be understood as opposition to conduct prohibited by the ADA. There is no evidence that the plaintiff raised the subject of his alleged disability. Therefore, the so-called "thin ice" conversation cannot be considered a protected expression for the purposes of the plaintiff's retaliation claim.

The plaintiff has provided evidence that he had a separate conversation with Laskaris prior to the "thin ice" conversation. (See Pl.'s Addendum of Exhibits, filing 148, Ex. B, McKay Aff. ¶¶ 69-72.) In this conversation, the plaintiff protested his car being taken away, and he told Laskaris, "You know, I am really not drinking, and I would never drink and drive." (Pl.'s

Addendum of Exhibits, filing 148, Ex. A, McKay Dep. at 197:16-17. See also id. at 197:4-23.) Laskaris confirms that at some point, the plaintiff came to Laskaris's office and told him that his car had been taken because of his "drinking." (See Pl.'s Addendum of Exhibits, filing 148, Ex. E, Laskaris Dep. at 55:4-56:20.) I find that there is a genuine issue whether the defendant could reasonably have understood the plaintiff's complaint to be opposition directed at conduct prohibited by the ADA. Therefore, for the purposes of the defendant's summary judgment motion, I shall consider this conversation to contain a protected expression for the purposes of the plaintiff's retaliation claim.

Although there is evidence that the plaintiff had other conversations with Laskaris because he "worked with him for a month on a daily basis," the plaintiff has provided no evidence that he raised his alcohol problem at any other time.[8] (Pl.'s Addendum of Exhibits, filing 148, Ex. A, McKay Dep. at 197:24-198:20.)

In sum, I reject the defendant's arguments that the plaintiff has failed to demonstrate that he engaged in a protected expression. First, the fact that the plaintiff was not actually disabled within the meaning of the ADA does not render his belief that he was engaging in protected expression objectively unreasonable per se. Secondly, the plaintiff has come forward with evidence that he made two complaints that the defendant could reasonably have interpreted as opposition to conduct prohibited by the ADA. The first of these complaints was made to Cohen on June 3, 1996, and the second was made to Laskaris at some unspecified time, perhaps sometime between the dates of June 13 and June 16, 1996. (See Pl.'s Addendum of Exhibits, filing 148, Ex. E, Laskaris Dep. at 54:4-18.) Both of these complaints concerned the plaintiff's loss of his demonstration car.

I shall turn now to the defendant's argument that the plaintiff suffered no adverse job actions.

## B.    Whether the Plaintiff Experienced an Adverse Job Action

In order for a plaintiff to maintain a successful claim of retaliation under the ADA, he must establish that he suffered an adverse employment action. See Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002) (citing Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640 (7th Cir. 2002)). See also Talanda v. KFC National Management Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1459 (7th Cir.1995)).

An employee claiming retaliation must show that he suffered a "materially

---

[8]For example, on approximately June 26, 1996, a conversation occurred between Laskaris and McKay wherein the plaintiff was informed of his termination from employment at Town & Country. There is no evidence that the plaintiff complained or objected during that conversation. (See Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 131:9-133:24.)

adverse employment action." McDonnell v. Cisneros, 84 F.3d 256, 258 (7th Cir. 1996). We have defined the phrase broadly in this circuit; it of course includes readily quantifiable losses such as loss or reduction of pay or monetary benefits, but it can encompass many other forms of adversity. See Smart [v. Ball State Univ.], 89 F.3d [437] at 441 [(7th Cir. 1996)] (citing examples). Adverse employment actions include "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Minor or trivial actions that make an employee unhappy are not sufficient to qualify as retaliation under the ADA. See Smart, 89 F.3d at 441.

Silk v. City of Chicago, 194 F.3d 788, 800 (7th Cir. 1999). "The question whether a change in an employee's job or working conditions is materially adverse, rather than essentially neutral, is one of fact . . . and so can be resolved on summary judgment only if the question is not fairly contestable." Basith v. Cook County, 241 F.3d 919, 933 (7th Cir. 2001) (quoting Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 273-74 (7th Cir. 1996)).


The defendant argues that a number of job actions that the plaintiff claims were taken against him do not qualify as materially adverse employment actions for the purposes of the plaintiff's retaliation claim. First, the defendant contends that the retroactive alteration in the plaintiff's pay plan was not an adverse employment action. (See Def.'s Br. at 10-11.) The defendant's argument is based on its assertion that "there is no evidence that Plaintiff would have been paid less under the new pay plan, assuming he did his job. As such, absent evidence of a material change in his earnings, Plaintiff cannot prove a material adverse job action on this issue."[9] (Def.'s Br. at 11.) In response, the plaintiff argues:

> The record also shows that the new plan was materially different from the old pay plan. Under the old pay plan as it was implemented, 12(N) 56, Plaintiff received a straight weekly take home salary of $1000, which he was not required to repay in any form. Id.. [sic] Under the pay plan instituted by Mr. Laskeris [sic], the Plaintiff received a *gross* payment of $1000 per week, which was a draw against commission *and any additional monies he received had to be repaid if commissions did not cover this amount.* 56.1b(B) 159-160. A reasonable juror, knowing the difference between gross and take home pay, could find this an adverse action.

---

[9]The defendant also claims that the plaintiff's pay plan was changed prior to June 3, when the plaintiff first disclosed his alcoholism. (See Def.'s Br. at 14-15.) At best, there is a genuine issue whether the pay plan was altered in March 1996, as the defendant claims. (See, e.g., Pl.'s Statement of Material Facts Pursuant to Local Rule 12(N), Response to Def.'s 12 (M) Statement (12(N)(I) [sic], filing 63, ¶ 54.) Therefore, I reject this argument.

(Pl.'s Br. at 28 (emphasis added).)  The portions of this response that I have emphasized are not supported by the evidence cited by the plaintiff.  In this response, the plaintiff first refers me to paragraph 56 of his response to the defendant's original statement of facts submitted in support of its first motion for summary judgment, which states in relevant part:

> e)  At one point, Mr. McKay stated to her that the deal was that he would take home $1000 per week.  She spoke to Ken [Bacigalupo] or Max [Cohen] and they agreed that was the deal.
>
> f)  . . . .
>
> Should the Court allow this statement, deny this was the pay plan Mr. McKay was paid on from May 1, 1996 until June of 1996:
>
> . . . .
>
> > iii)  Mr. Bacigalupo stated that Mr. Cohen agreed with Mr. McKay that Mr. McKay was going to continue to take home $1000 in take home pay and that Mr. Cohen told him not to worry about the pay plan.
> >
> > iv)  Mr. Laskeris [sic] wrote a memorandum to payroll dated June 21, 1996 (five days before Mr. McKay was terminated) which states that Mr. McKay is to be advanced $1000/week as a guaranteed draw.  The document is not stamped until June 27, 1996, the day after Mr. McKay was terminated.

(Pl.'s Statement of Material Facts Pursuant to Local Rule 12(N), Response to Def.'s 12 (M) Statement (12(N)(I) [sic], filing 63, ¶ 56 (citations omitted).)  For two reasons, it seems to me that the "statement of fact" cited by the plaintiff actually suggests that there was <u>no material difference</u> between the old and new pay plans.

First, the evidence quoted above does not in any way suggest that there is any difference between Mr. McKay's $1000 "take home" pay and McKay's $1000/week "guaranteed draw."  Put differently, there is no support for the plaintiff's argument that "a reasonable juror, knowing the difference between gross and take home pay," could appreciate the difference between the plans described in subparagraphs "f) iii)" and "f) iv)."  The plaintiff has referred me to no evidence that the "take home" pay plan consisted of money that would not have to be repaid, while the "guaranteed draw" pay plan consisted of money that would have to be repaid if the plaintiff failed to earn adequate money in commissions.

In passing, I note that the evidence cited in support of subparagraph "f) iii)" states as follows:

> Q: And he [McKay] then says that you talked to Max and Max essentially agreed not to implement the pay plan as such?
> A: Yes.  There was - - Bob was concerned about his weekly take-home pay, and I think in his original pay plan he had a draw that he would take over and above his

salary that would be charged against commission, and Bob was I think more
concerned with that number being kept the same than anything else. He needed
"X" amount of dollars a week to run his family.
Q: Does a thousand dollars a week sound about right?
A: It sounds right.
Q: Bob had an agreement that essentially he would take home a thousand dollars a
week no matter what?
A: It sounds right.
Q: And Max agreed that yes, that was going to happen; he was going to take home
a thousand a week?
A: Yes.

(Def.'s Addendum of Exhibits, filing 49, Ex. C, Bacigalupo Dep. at 118:17-119:14.) There is no
evidence that the plaintiff would not have "taken home" $1000 per week under the "guaranteed
draw" formulation of the pay plan. Therefore, the evidence cited does not support the plaintiff's
claim that his plan changed to his detriment when it was reframed as a "guaranteed draw" instead
of "take home" pay.

        Second, there is a more obvious reason why the plaintiff's evidence fails to show that the
plaintiff was paid on a new, materially different plan consisting of a $1000 "guaranteed draw" as
opposed to a $1000 "take home." The plaintiff's "statement of fact" claims at subparagraph "f)
iv)" that the document implementing the "guaranteed draw" plan was not stamped until the day
after the plaintiff's termination. (See Pl.'s Statement of Material Facts Pursuant to Local Rule
12(N), Response to Def.'s 12 (M) Statement (12(N)(I) [sic], filing 63, ¶ 56(f)(iv). See also Pl.'s
Addendum of Exhibits, filing 148, Ex. T.) It seems that the plaintiff's own evidence suggests
that the "guaranteed draw" plan might not have been implemented during the plaintiff's
employment at Town and Country. In other words, the plaintiff has not explained how the
change to a $1000 per week "guaranteed draw" pay plan could amount to an adverse employment
action against him if he were never actually paid under that plan. As I will discuss presently,
there is no evidence that the plaintiff was ever subject to a pay plan that required him to repay
negative balances on his draw.

        The plaintiff has attempted to argue that an adverse employment action occurred when he
was switched from a $1000 weekly salary to a $1000 weekly advance on commissions that would
be repayable if the plaintiff's sales were insufficient to meet the advance. The evidence cited by
the plaintiff simply does not support his argument that the "guaranteed" draw would be repayable
or that he was ever actually subject to such a plan. Although I am not required to root about in
the record in order to make arguments on behalf of the plaintiff, see United States v. Dunkel, 927
F.2d 955, 956 (7th Cir. 1991), I have discovered evidence suggesting that within approximately
one week of the plaintiff's termination, Laskaris "changed" McKay's pay plan to include an
additional $100 per week car allowance, forgave McKay's existing negative balance on his draw,
and told the plaintiff that "in the future," he would have to repay any negative balance on his

draw. (See Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 117:10-122:6.)[10] However, there is no evidence that this new plan was actually implemented prior to the plaintiff's termination. On the contrary, the plaintiff has all but sworn the opposite. In his affidavit, the plaintiff states that he was never paid the $100 per week car allowance because he "was terminated before this was put into effect." (See Pl.'s Addendum of Exhibits, filing 148, Ex. B, McKay Aff. ¶¶ 73-74.) Since the evidence suggests that the $100 weekly car allowance and the "guaranteed draw" pay plan were to be part of the same alteration to the plaintiff's pay structure (see Pl.'s Addendum of Exhibits, filing 148, Ex. T; Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 119:6-16), I do not appreciate the plaintiff's attempt to argue in one section of his brief that his pay plan was changed, while claiming in another section that this plan was never put into effect.

At any rate, there is no evidence that the plaintiff was ever paid according to a plan that provided him with less than $1000 per week in pay[11] or required him to repay the defendant for advances on commissions that were unearned. Although it is possible that the plaintiff's pay for his final week of work would have been made pursuant to a new plan derived by Laskaris and reflected in Plaintiff's Exhibit T, there is no evidence before me that this occurred, and in fact the plaintiff himself appears to claim that this plan was not implemented prior to his termination.

The plaintiff asserts that the defendant's argument should be rejected because the defendant referred to no evidence to support its claim that "there is no evidence that Plaintiff would have been paid less under the new pay plan." (See Def.'s Br. at 11.) However, there is no requirement that a party moving for summary judgment cite to pleadings, depositions, answers to interrogatories, and admissions on file or submit affidavits to demonstrate that there are *no* "evidentiary" materials supporting a claim. Such an argument defies logic, for what could a moving party cite to in order to show an absence of evidence (except perhaps the entire record)? Indeed, the Supreme Court has stated, "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The plaintiff could have defeated the defendant's argument by simply referring me to *any* evidence that his pay plan actually changed to his detriment any time after he declared his alcoholism to Cohen on June 3, 1996. He was unable to do this.

In sum, there is no evidence that the plaintiff made less money under the "new" pay plan; indeed, there is no evidence that the plaintiff was ever even paid pursuant to the "new" plan. Therefore, I agree with the defendant that there is no evidence that the plaintiff's pay plan was

---

[10]The plaintiff referred me to paragraphs 54-59 of his "Statement of Material Facts Pursuant to Local Rule 12(N), Response to Def.'s 12 (M) Statement (12(N)(I)" [sic], filing 63. (See Pl.'s Br. at 27.) The evidence I uncovered is referenced in paragraph 60 of that document.

[11]There is evidence, however, that deductions were made from the plaintiff's pay for personal phone calls and absences. (See supra Part I.) These will be addressed below.

altered in a manner that could be characterized as an adverse employment action.

Next, the defendant argues that its seizure of the plaintiff's demonstrator car was not a "materially" adverse employment action because the defendant sold the plaintiff a vehicle "at cost" and gave the plaintiff $100 per week to "pay for said car and insurance in order to make up for his demonstrator car." (Def.'s Br. at 11.) The defendant's description of the evidence is incomplete and misleading. The plaintiff was sold a used vehicle at cost to replace a new vehicle that he drove at no charge, and there is evidence that the plaintiff never did receive $100 per week to offset the costs associated with the loss of his demonstration vehicle. (See Pl.'s Addendum of Exhibits, filing 148, Ex. B, McKay Aff. ¶¶ 73-74.) Nevertheless, the defendant claims that "Plaintiff's complaint, in a nutshell, is that he was not able to drive a 'new Cadillac.'" (Def.'s Reply Br. at 29.) It seems to me that there is a genuine issue whether the loss of this free, new, and insured demonstration vehicle materially affected a term, condition, or privilege of the plaintiff's employment, and I do not agree with the defendant's suggestion that the loss of the vehicle can amount only to a "[m]inor or trivial action[] that make[s] an employee unhappy." Silk v. City of Chicago, 194 F.3d 788, 800 (7th Cir. 1999).

The defendant also claims that its decision to charge the plaintiff $230.51 for personal phone calls "was merely trivial" and did not amount to a materially adverse employment action. The plaintiff responds that the $230.51 charge amounted to "roughly 25% of Plaintiff's take home pay that week." (Pl.'s Br. at 30.) The plaintiff's response is not persuasive. Indeed, I fail to see how the fact that the dollar amount of the charge added up to about twenty-five percent of the plaintiff's one-week pay is relevant to the question of whether the charge constitutes a materially adverse employment action. It is undisputed that the plaintiff made the personal calls that he was charged for. Therefore, the amount of the charge was determined solely by the plaintiff's own personal use of the phone. If he had used the phone more often for personal calls, the amount of the charge could have been thirty, forty, or fifty percent of his salary for that week. If I were to accept the plaintiff's reasoning, the plaintiff's argument that he suffered an adverse employment action would be strengthened with each additional personal phone call he made from his office that his employer decided to charge against him.[12]

The Seventh Circuit has stated that, "Although creating a precise list of activities that constitute adverse employment actions would be impossible because of the unique circumstances of individual cases, we have indicated that materially adverse actions may include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465-66 (7th Cir. 2002) (quoting Ribando v. United Airlines, Inc., 200 F.3d 507, 510 (7th Cir.1999)). Perhaps the plaintiff might have reasonably argued that the privilege of making free personal

---

[12]In addition, I notice that the evidence does not support the plaintiff's math. (See Pl.'s Addendum of Exhibits, filing 59, Ex. 7 (stating that the deductions from the plaintiff's pay were subtracted from a figure of $1530.00, as opposed to $1000 as argued by the plaintiff.))

phone calls during working hours was a benefit afforded to the defendant's employees, that this was a material benefit, and that the plaintiff's loss this benefit amounted to an adverse employment action. However, he chose not make this or any other similar argument.[13] I conclude that a one-time charge of $230.51 for personal phone calls admittedly placed by the plaintiff while at work is not a materially adverse employment action. The fact that the plaintiff would have to pay for any personal calls he chose to make while at work is the sort of minor or trivial action that might make an employee unhappy, but is not sufficient to qualify as retaliation under the ADA. See Silk v. City of Chicago, 194 F.3d 788, 800 (7th Cir. 1999).

The defendant next argues that the plaintiff cannot claim that he suffered an adverse employment action when he was asked to repay the negative balance on his draw, because the evidence shows that in fact the plaintiff was never required to repay this negative balance. The plaintiff responds by arguing that Laskaris "insisted" that the plaintiff repay his draw, and that this insistence, combined with "other actions," amounts to harassment. (See Pl.'s Br. at 31.) The plaintiff's argument is without merit. It is undisputed that Laskaris did not require the plaintiff to repay the negative balance, and I find that there is no evidence that the plaintiff was "harassed" about the draw issue. (See Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 121:6-122:10.) Since there is no genuine issue that the plaintiff was not required to repay any negative balance on his draw, I agree with the defendant that the plaintiff has not suffered an adverse employment action.

Finally, the defendant argues that the plaintiff cannot claim that he received performance evaluations that amount to adverse employment actions. In this case, the negative performance evaluations consists of Laskaris's statements to the plaintiff that the latter needed to "sell more cars." (See Town & Country Cadillac's Statement of Material Facts In Support of Its Mot. for Summ. J. on Pl.'s Retaliation Claim, filing 130, ¶¶ 26-28.) The defendant relies upon Smart v. Ball State Univ., 89 F.3d 437, 442 (7th Cir. 1996) for the proposition that negative performance evaluations cannot constitute an adverse employment action. However, in Smart the court recognized that where a negative evaluation forms the basis of a demotion or termination, the negative evaluation might constitute an adverse employment action when considered jointly with the demotion or termination. Smart v. Ball State Univ., 89 F.3d at 442. Here, the defendant claims that the plaintiff's termination was justified by his failure to improve his performance. (See Town & Country Cadillac's Statement of Material Facts In Support of Its Mot. for Summ. J. on Pl.'s Retaliation Claim, filing 130, ¶¶ 26-31.) Under these circumstances, I shall consider Laskaris's employment evaluations of the plaintiff jointly with the plaintiff's termination.

The defendant has not argued that the plaintiff's termination is not an adverse employment action. Nor has the defendant argued that its decision to dock the plaintiff's pay for

---

[13]Such an argument might not have been successful even if it had been made, since much of the plaintiff's evidence of personal phone calls made by other employees has been stricken. (See Mem. and Order on the "Defendant's Motion to Strike the Affidavit of Ken Bacigalupo–Exhibit H and Phone Records–Exhibit R.")

absences did not constitute an adverse employment action. In addition to these, the plaintiff suggests that he has identified three other materially adverse employment actions that the defendant has not disputed. Specifically, the plaintiff claims that he did not receive vacation pay, that he was defamed, and that he suffered "intentional infliction of emotional distress." (Pl.'s Br. at 26.) The only evidence that I have been made aware of regarding the plaintiff's vacation pay is the plaintiff's statement, "I do not remember getting my vacation pay." (Def.'s Addendum of Exhibits, filing 49, Ex. B, McKay Dep. at 23:14.) The plaintiff agreed that if he did not get his vacation pay, he would claim that this was the result of some discriminatory act. (See id. at 23:15-19.) The plaintiff has referred me to no evidence indicating that he actually did not receive this vacation pay. Speculation is insufficient to defeat a summary judgment motion. See Borcky v. Maytag Corporation, 248 F.3d 691, 695 (7th Cir. 2001). Thus, I find that the "vacation pay" issue shall not be considered as an adverse employment action.

The plaintiff's claim that his causes of action for defamation and intentional infliction of emotional distress constitute materially adverse employment actions is skeletal and meritless. The plaintiff's theory seems to be twofold. First, the plaintiff appears to claim that merely because he stated in his deposition that he believes his causes of action for defamation and intentional infliction of emotional distress should be considered "acts of discrimination," those counts should be considered "materially adverse employment actions" for the purposes of the plaintiff's retaliation claim. The plaintiff has provided no argument that the claims qualify as adverse employment actions under the standards set forth in Silk or Hilt-Dyson, and I am not inclined to make his argument for him. See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal "argument," really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs."). Secondly, the plaintiff claims, almost as if it were a casual afterthought, that "the Seventh Circuit has allowed retaliation claims for harassment and vicious gossip." (Pl.'s Br. at 26-27 (citing Knox v. Indiana, 93 F.3d 1327, 1334-35 (7th Cir. 1996)).) This argument is the essence of "skeletal." In Knox v. Indiana, 93 F.3d 1327 (7th Cir. 1996), the court stated:

> Nothing indicates why a different form of retaliation--namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII--does not fall within the statute. The law deliberately does not take a "laundry list" approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit. The instructions here correctly left the jury free to evaluate the record as a whole and to decide whether the State (in the person of the prison officials) retaliated against Knox for causing (by her invocation of Title VII rights) the demotion of the Lead Captain in the prison, by sitting on its hands in the face of the campaign of co-worker harassment about which it knew no later than May 7, 1992.

Knox v. Indiana, 93 F.3d at 1334-35. From this, perhaps I am to infer that the plaintiff could potentially argue that something similar happened in this case: that McKay experienced retaliation in the form of a campaign of harassment consisting of defamation and intentional

infliction of emotional distress, directed at him from his co-workers or Cohen, and that the defendant sat on its proverbial hands and did nothing to stop it, and that this sitting on the hands amounts to an adverse employment action. The plaintiff has argued none of this, however, and he has referred me to no evidence that could support such a theory. I shall not lay flesh upon the plaintiff's skeletal argument for him, if indeed a single case citation with no meaningful supporting explanation can be considered an "argument." As a result I readily conclude that the plaintiff's defamation and intentional infliction of emotional distress claims shall not be considered adverse employment actions for the purpose of his retaliation claim.

In sum, there is a genuine issue for trial whether the plaintiff experienced adverse employment actions in the form of the loss of his demonstration vehicle; his termination and any associated negative performance evaluations; and his loss of pay for absences. I shall now turn to the defendant's argument that the plaintiff has failed to demonstrate a causal connection between his protected expressions and an adverse employment action.

### C.    Whether There Is a Causal Link Between the Plaintiff's Protected Expressions and the Adverse Actions

The Seventh Circuit has recently clarified that a plaintiff proceeding under the indirect, McDonnell Douglas method of proving a retaliation claim is no longer required to demonstrate a causal link between the protected expression and the adverse action. Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 643-44 (7th Cir. 2002). Therefore, to the extent that the plaintiff's retaliation claim is grounded upon the McDonnell Douglas framework, the defendant's argument that it is entitled to summary judgment because the plaintiff is unable to demonstrate a causal link between his protected expressions and an adverse employment action must be rejected. However, the plaintiff has responded to the defendant's argument, claiming that there is indeed a causal connection between his complaints and the actions that were taken against him. (See Pl.'s Br. at 32-41.) Therefore, I shall evaluate the parties' causal arguments under the "direct evidence" analysis presented in Stone. See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 643-44. If there is no genuine issue whether there is a causal connection, then the defendant will be entitled to summary judgment to the extent that the plaintiff's retaliation claim is based upon "direct evidence." See id. at 644.

There is no straightforward test for determining whether a causal connection exists. In Horowitz v. Board of Educ. of Avoca School Dist. No. 37, 260 F.3d 602, 613 (7th Cir. 2001), the court stated, "To establish the last element in a retaliation case, - -that is, the causal connection requirement- - [the plaintiff] needed to prove that [her employer's] decision to terminate her and the EEOC charges and current lawsuit *were not wholly unrelated*." Horowitz v. Board of Educ. of Avoca School Dist. No. 37, 260 F.3d 602, 613 (7th Cir. 2001) (citation omitted) (emphasis added). In Basith v. Cook County, 241 F.3d 919, 933 (7th Cir. 2001), the court found that "to prove the third element of his prima facie case, causation, [the plaintiff] must show that [the defendant] would not have taken the adverse employment actions *"but for"* his protected expression." Basith v. Cook County, 241 F.3d 919, 933 (7th Cir. 2001) (emphasis added).

Naturally, the parties disagree about the appropriate formulation of the test for the purposes of the present case. The defendant prefers the "but for" version set forth in Basith, while the plaintiff advocates the "not wholly unrelated" test.[14] Fortunately, the Seventh Circuit has partly resolved this confusion. See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 643-44 (7th Cir. 2002). It is now clear that the "obscure" causal test based upon the concept of "not wholly unrelated" is "jettisoned." See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644. In addition, the Seventh Circuit stated:

> The plaintiff in a retaliation case should have two (and only two) distinct routes to obtaining/preventing summary judgment. One, the more straightforward, the one that is unrelated to McDonnell Douglas, is to present *direct evidence* (evidence that establishes *without resort to inferences from circumstantial evidence*) that he engaged in protected activity (filing a charge of discrimination) and *as a result* suffered the adverse employment action of which he complains.

Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644 (emphasis added). Therefore, under Stone, a plaintiff attempting to set forth a prima facie case of retaliation using the "direct method" must present direct, as opposed to circumstantial, evidence of a causal connection between his protected activity and an adverse employment action. As I noted above, the plaintiff pursuing the second route to establishing a prima facie case of retaliation, which is based on the McDonnell Douglas framework, "need not show even an attenuated causal link." See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644.

Although Stone explicitly states that circumstantial evidence of a causal relationship between a protected expression and adverse employment action is unhelpful in a "direct evidence" case and is unnecessary in a "McDonnell Douglas" case, see Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644, the court adds the following comment:

> The question of how much evidence the plaintiff must present to establish a triable issue that the adverse employment action of which he complains was retaliatory is not susceptible of a general answer. But we remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue.

Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644 (citations omitted). I find I am having difficulty reconciling the comment that temporal proximity alone may, though only rarely, create a triable causation issue with the court's statement that circumstantial evidence unaccompanied by direct evidence of a causal connection is insufficient under the "direct

---

[14]Strangely, the plaintiff relies on Fifth Circuit precedent to argue in favor of the "not wholly unrelated" test. (See Pl.'s Br. at 32 (citing Medina v. Ramsey Steel Co., 238 F.3d 674, 684 (5th Cir. 2001).)

evidence" route of establishing a prima facie case of retaliation. See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644. It seems to me that temporal proximity or "suspicious timing" provides at best only circumstantial evidence of a causal connection. While circumstantial evidence of a causal connection was formerly relevant under the McDonnell Douglas method of establishing a prima facie case of retaliation, Stone makes clear that such evidence is no longer required. See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 643-44.

I shall proceed to evaluate the parties' arguments concerning the causal relationship between the alleged protected expressions and adverse employment actions using the "direct evidence" framework set forth in Stone. If the plaintiff is able to refer me to direct evidence - - evidence that is not grounded upon inferences from circumstantial evidence - - of a causal relationship between any of his protected expressions and any adverse employment action, then I shall conclude that to the extent that he claims he can proceed under the "direct evidence" route, he has established a prima facie case of retaliation.

Preliminarily, I note that the only protected expressions that need to be addressed are: 1) the plaintiff's June 3, 1996, complaint to Cohen about Cohen's threat to take away the plaintiff's demonstration vehicle; and 2) the plaintiff's subsequent complaint to Laskaris about the loss of his demonstration vehicle. (See supra Part III.A.2.) In addition, the only adverse employment actions that remain to be considered are: 1) the plaintiff's loss of his demonstration vehicle; 2) the plaintiff's termination and any associated negative performance evaluations; and 3) the plaintiff's loss of pay for absences. (See supra Part III.B.)

The defendant first argues that the allegedly retroactive implementation of the plaintiff's pay plan did not occur as a result of the plaintiff's protected expressions. (See Def.'s Br. at 14-15.) Since there is no evidence that any alteration to the plaintiff's pay plan took effect prior to the plaintiff's termination, I concluded that the plaintiff's "pay plan" did not amount to an adverse employment action. (See supra Part III.B.) Therefore, it is irrelevant whether there is a causal relationship between the plaintiff's pay plan and any protected expression. Additionally, the plaintiff has referred me to no direct evidence of a causal connection between the alleged change in his pay plan and either of his protected expressions. (See Pl.'s Br. at 35-36.)

Next, the defendant argues that the plaintiff's loss of his demonstration car could not have been the result of any protected expression on the part of the plaintiff, because the seizure of the car "was the first purported action taken against him." In response, the plaintiff argues that the defendant took away his demonstration vehicle because the plaintiff revealed his alcoholism to Cohen:

> Here, Cohen, Defendant's president, admitted in deposition that he decided to take Plaintiff's demonstrator car away because Plaintiff revealed his alcoholism, 12(N) 50(a), direct evidence of the causal link to Plaintiff's protected activity.
> . . . .

Cohen admitted he took Mr. McKay's demonstration vehicle away because Mr. McKay revealed he was an alcoholic. 12(N) 50. He also stated he was 'disappointed' in Mr. McKay when he learned he was an alcoholic. 56.1b(B)221-222. Immediately and over the next 2 ½ weeks, Cohen denigrated Mr. McKay for his alcoholism - he called Mr. McKay a drunk and accused him (without factual foundation) of driving under the influence to Ken Bacigalupo, General Manager, Bob Novak, Service Manager, and numerous times in the public areas of Town and Country in front of employees and customers. 56.1b(B) 223-232. This is evidence of bias toward plaintiff based on the protected activity, and evidence of a propensity of the decision maker to evaluate the employee based on an illegal criteria [sic].

(Pl.'s Br. at 33-34.) The plaintiff's argument would be persuasive but for the fact that his revelation of his alcoholism was not a protected expression for the purposes of his retaliation claim. (See supra Part III.A.2. n.6 and accompanying text.) In other words, even if it is true that Cohen took the plaintiff's car because the plaintiff revealed his alcoholism, as the plaintiff argues, this does not mean that the car was taken because the plaintiff *opposed conduct made unlawful by the ADA*. The plaintiff's argument might have favored his claim of discrimination in violation of the ADA, had it not been determined that the plaintiff was not disabled. However, the plaintiff's case is now based upon *retaliation*, not *discrimination*.

I have found that *after* the plaintiff revealed his alcoholism to Cohen and *after* Cohen disparaged the plaintiff and told him that his car would be taken, the plaintiff engaged in protected expression by objecting to Cohen's threat to take the plaintiff's car. (See supra Part III.B.) Soon after the plaintiff's conversation with Cohen, the car was indeed taken from the plaintiff. However, the plaintiff has not argued that this protected expression had a causal relationship to the seizure of his demonstration car. Such an argument would likely have failed in any event, for it would be awkward to claim that after Cohen already told the plaintiff that he would confiscate the car, the plaintiff complained to Cohen *and that this complaint, rather than Cohen's initial reaction to learning about the plaintiff's alcoholism, is the event that caused the car to be confiscated.* Since the only other protected expression occurred after the plaintiff's car was taken by Cohen, there is no genuine issue for trial. The seizure of the plaintiff's demonstration vehicle had no causal relationship to any protected expression.

The defendant next argues that the charges imposed on the plaintiff for personal phone calls did not occur as a result of the plaintiff's protected expressions. (See Def.'s Br. at 15.) Since the charges do not amount to an adverse employment action (see supra Part III.B), it is irrelevant whether there is a causal relationship between the charges and any protected expression.

There is undisputed evidence that the plaintiff's pay was docked for two absences, and it is undisputed that this docking amounted to an adverse employment action. The defendant argues that "Plaintiff has no evidence to show that he was docked for opposing unlawful

discrimination under the ADA." (Def.'s Br. at 16.) The plaintiff responds, "Immediately after Plaintiff revealed his alcoholism and complained about the car being taken away, Cohen docked Mr. McKay for two sick days claiming a failure to call in." Indeed, the evidence before me does include a "speed letter" from Michelle Shultze to payroll dated June 4, 1996, stating that the plaintiff's pay for the week ending June 1, 1996, was to be docked for absences on May 31 and June 1. (See Pl.'s Addendum of Exhibits, filing 59, Ex. 7.) Since the plaintiff revealed his alcoholism to Cohen and objected to Cohen's threat to take the demonstration car on June 3, 1996, the adverse employment action (i.e., the pay deduction for absences) falls directly on the heels of a protected expression (i.e., the plaintiff's opposition to Cohen's decision to seize his demonstration car). I recognize that the Seventh Circuit has stated that suspicious timing alone can, though only rarely, create a triable issue of causation. See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644. However, I also recognize that in order for a plaintiff to proceed under the direct evidence route of establishing a prima facie case, he must present evidence of a causal connection that is not based upon inferences from circumstantial evidence. See id. Since the plaintiff has referred me to no direct evidence that his pay was docked as a result of his complaint about his car being taken away, I must conclude that he has failed to establish a prima facie case of retaliation using the "direct evidence" method.

The defendant next argues that since there is no evidence that the plaintiff was ever required to pay a negative balance on his draw, he cannot claim that he was required to repay a negative balance because he engaged in a protected expression. I agree. Without evidence of an adverse employment action, this claim cannot form the basis of a retaliation claim under either of the two frameworks set forth in Stone. See Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644.

Next, the defendant argues that there is no causal connection between the plaintiff's negative performance evaluations, his termination, and any protected expression. In response, the plaintiff argues that there is evidence of a meeting during which Cohen and Laskaris discussed terminating McKay, and that Cohen is a person "whose testimony shows the discriminatory intent and attitudes." (See Pl.'s Br. at 36.) Again, this is a retaliation case, not a discrimination case. The evidence referred to by the plaintiff does not establish a causal connection between McKay's termination and any protected expression.

However, the plaintiff goes on to argue that "[u]ntil Mr. McKay revealed his alcoholism *and complained about the actions being taken against him*, there was absolutely no issue about his performance. . . . But Mr. McKay's revelation of his alcoholism and *complaints* changed Cohen's attitude and actions dramatically." (Pl.'s Br. at 36.) Here, the plaintiff has argued that there is a direct causal relationship between his complaints and the negative employment evaluations that were used to justify his termination. However, the evidence cited by the plaintiff does not support his argument that his *complaints* changed Cohen's attitudes about his performance. (See Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶¶ 220-247.) Instead, all of the statements of fact cited by the plaintiff claim that it was the plaintiff's revelation of his alcoholism to Cohen, not the plaintiff's complaints about the loss of his demonstration vehicle,

that led to the negative performance evaluations of the plaintiff.  (See id.)  For example, paragraphs 241-243 state:

> 241.    Before Mr. McKay revealed his alcoholism, Mr. Bacigalupo had the opportunity to observe Mr. Cohen interact with Mr. McKay.  Mr. Cohen got along real well with Mr. McKay.
>
> 242.    Mr. Bacigalupo was of the opinion from his experience with Mr. Cohen that Mr. Cohen was down on Mr. McKay after he admitted his alcoholism and it would only be a matter of time until Mr. McKay was gone.
>
> 243.    The fact that Mr. McKay admitted his drinking was the one thing in his experience that could turn Mr. Cohen around and against Mr. McKay.

(Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶¶ 241-243.)  Instead of *direct evidence* of a causal connection between McKay's *complaints* and his negative performance evaluations and termination, the plaintiff has provided me with *circumstantial evidence* that his negative evaluations and termination were caused by his *revelation of his alcoholism*.  Indeed, if paragraph 243 is to be taken literally, the plaintiff has provided evidence suggesting that his complaint about the loss of his car was not the "one thing" that could turn Cohen against McKay.  (Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶ 243.)  Since the plaintiff's revelation of his alcoholism was not a protected expression for the purposes of his retaliation claim (as it does not qualify as opposition to conduct made unlawful by the ADA), the plaintiff has provided no evidence to support his argument that his negative performance evaluations and termination were caused by one of his protected expressions.

There is no direct evidence of a causal relationship between either of McKay's protected expressions (i.e., complaints to Cohen and Laskaris about the loss of his demonstration vehicle) and any of the adverse employment actions that were taken against him (i.e., the plaintiff's loss of his demonstration vehicle, the plaintiff's termination and any associated negative performance evaluations, and the plaintiff's loss of pay for absences).  Therefore, the plaintiff has failed to establish a prima facie case of retaliation under the "direct evidence" approach discussed in Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644.

### D.    Whether the Defendant Has Articulated a Legitimate, Noninvidious Reason for the Adverse Employment Actions, and Whether the Plaintiff Can Demonstrate That the Defendant's Proffered Reason Was a Pretext for Unlawful Conduct

In order to establish a prima facie case of retaliation under the McDonnell Douglas approach, a plaintiff is not required to come forth with evidence of "even an attenuated causal link" between a protected expression and an adverse employment action.  Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644.  Instead, he must show that after engaging in a protected expression "only he, and not any similarly situated employee who did not [engage in protected expression], was subjected to an adverse employment action even though he was performing his job in a satisfactory manner."  Id.  See also Hilt-Dyson v. City of Chicago, 282

F.3d 456, 465 (7th Cir. 2002) ("[A]n employee must demonstrate that: (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity."). In this case, the defendant has not argued that the plaintiff was not treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Nor has the defendant *expressly* argued that it is entitled to summary judgment because the plaintiff was not performing his job in a satisfactory manner. (See Def.'s Br. at 2. But see id. at 16-18 (arguing that the defendant had legitimate, nondiscriminatory reasons for its actions because the plaintiff was performing inadequately.).) Instead, it has attacked the remaining two components of the plaintiff's prima facie case under the McDonnell Douglas framework, arguing that there is no evidence that the plaintiff engaged in statutorily protected expressions or that the plaintiff suffered from an adverse employment action. I have agreed with the defendant in part, finding that the plaintiff's protected expressions consist only of the plaintiff's complaints to Cohen and Laskaris about the loss of the demonstration vehicle, and that the only materially adverse employment actions suffered by the plaintiff consist of the plaintiff's loss of his demonstration vehicle, the plaintiff's termination and any associated negative performance evaluations, the plaintiff's loss of pay for absences. However, this means that under the McDonnell Douglas retaliation framework, the defendant has failed to show that there is no genuine issue and that it is entitled to judgment as a matter of law because the plaintiff has not established a prima facie case of retaliation.

Nevertheless, even if a plaintiff establishes a prima facie case of retaliation, a defendant may be entitled to summary judgment. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment." Stone v. City of Indianapolis Public Utilities Division, 281 F.3d at 644. See also Hilt-Dyson v. City of Chicago, 282 F.3d at 465 ("Once the defendant has [offered a legitimate, noninvidious reason for the adverse employment action], the burden of production shifts back to the plaintiff to demonstrate the pretextual nature of the proffered reason."). It is to this issue that I now turn.

The defendant argues that it had legitimate, noninvidious reasons for each of the three adverse employment actions that occurred in this case. I shall examine each adverse employment action in turn to determine whether the plaintiff can demonstrate that the defendant's proffered reasons are pretextual.

1.    The Seizure of the Plaintiff's Demonstration Vehicle

The defendant argues that, "as this Court has duly noted, Plaintiff's demonstration vehicle was taken away for legitimate business concerns related to insurance and liability issues surrounding Plaintiff's continued use of the vehicle." (Def.'s Br. at 15.) I find no evidence that "this Court has duly noted" that the plaintiff's car was taken for legitimate business concerns related to insurance and liability issues. (See generally Mem. and Order on Def. Town & Country Cadillac's Mot. for Summ. J., filing 99.) There is evidence, however, that Cohen stated

32

that he would have had insurance problems if McKay had an accident while driving under the influence, and that this is why he seized the plaintiff's demonstration car. (See Def.'s Addendum of Exhibits, filing 49, Ex. A, Cohen Dep. at 277:13-280:23.)

A plaintiff may present either direct or indirect evidence in order to demonstrate that the "legitimate" reason provided by his employer is pretextual:

> A plaintiff may establish that the reasons offered for her termination were a pretext for retaliation by presenting either direct evidence indicating that the defendant was "'more likely than not motivated by a discriminatory reason,' or indirect evidence showing that the defendant['s] stated reasons are not credible." [Alexander v. Wisc. Dep't of Health and Family Services, 263 F.3d 673, 681- 82 (7th Cir. 2001)] (quoting Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1039 (7th Cir. 1993)). Because Rizzo has provided no direct evidence of retaliation in this case, she must rely on indirect evidence to demonstrate that Sheahan's stated reasons were pretextual. To do so, Rizzo must prove "one of the following: (1) Defendant's explanation of Plaintiff's discharge had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient to warrant the [allegedly retaliatory action]." Johnson v. Nordstrom, Inc., 260 F.3d 727, 732 (7th Cir. 2001) (quotation omitted).

Rizzo v. Sheahan, 266 F.3d 705, 715 (7th Cir. 2001). In this case, as in Rizzo, the plaintiff has no direct evidence that the loss of his demonstration car was retaliatory. (See supra Part III.C.) Therefore he may attempt to show that the defendant's proffered reason either 1) has no basis in fact; 2) was not the "real" reason for the seizure of the car; or 3) insufficient to warrant the seizure of the car. See Rizzo v. Sheahan, 266 F.3d at 715.

Here, the plaintiff has provided evidence that insurance concerns were not the real reason for the seizure of the car. There is evidence that Cohen took the car because he did not want a "drunk" or a "drug addict" driving his car. (See Pl.'s "Response to Def.'s 56.1(A) Statement - 56.1(b)(3)(A)," filing 147, ¶ 81(k).) There is also evidence that other employees were not asked whether they drank before they were provided with a demonstration vehicle. (See Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶¶ 111-112.) Perhaps most importantly, the plaintiff has provided evidence that several other employees had offenses on their driving records before they applied for approval by the defendant's insurer, and these employees nevertheless received coverage. (See Pl.'s Statement of Material Facts Pursuant to Local Rule 12(N), Response to Def.'s 12 (M) Statement (12(N)(I) [sic], filing 63, ¶ 50(s)-(t).) One of these employees disclosed a "DUI" on his insurance application; yet he was allowed to drive an insured demonstration vehicle. (See id.) I find that there is sufficient evidence to rebut the defendant's claim that it had a legitimate, noninvidious reason for seizing the plaintiff's discrimination vehicle.

2. The Docking of the Plaintiff's Pay for Absences on May 31, 1996 and June 1, 1996

The defendant argues that it had legitimate business reasons for docking the plaintiff's pay for absences. Specifically, the defendant claims that pursuant to its attendance policy, all employees are required to call in before they are absent from work, and Cohen has stated that McKay's pay was docked because he believed that McKay did not call in prior to his absences on May 31, 1996, and June 1, 1996. (Def.'s Statement of Material Facts, filing 130, ¶¶ 62, 64.) However, the plaintiff has referred me to evidence that he did indeed call in prior to his absences on those days, and that Cohen may have been aware of that fact. (See Pl.'s Statement of Material Facts Pursuant to Local Rule 12(N), Response to Def.'s 12 (M) Statement (12(N)(I) [sic], filing 63, ¶ 62.) Again, I find that there is sufficient evidence to rebut the defendant's claim that it had a legitimate, noninvidious reason for seizing the plaintiff's discrimination vehicle, because there is a genuine issue whether the defendant's proffered reason (i.e., the plaintiff's failure to call in) was the "real" reason for the deduction from the plaintiff's pay. See Rizzo v. Sheahan, 266 F.3d at 715.

3. The Negative Evaluations of the Plaintiff and the Plaintiff's Termination

Finally, the defendant argues that it had legitimate business reasons for its negative employment evaluations of the plaintiff, and that the plaintiff's termination was based on those legitimate evaluations. Specifically, the defendant refers me to evidence that the plaintiff was "negative in his draw" prior to his disclosure of alcoholism, and that Laskaris, who was purchasing Town & Country Cadillac, needed the plaintiff to sell more cars to make the dealership profitable. (See Def.'s Br. at 17.) The defendant argues that on several occasions, Laskaris communicated to the plaintiff that more cars needed to be sold and that the plaintiff needed to give more effort, pay attention to the floor, and avoid daydreaming. (See Def.'s Statement of Material Facts, filing 130, ¶¶ 25-30.) The defendant contends that the plaintiff was terminated for failing to improve his performance in these areas. (See Def.'s Br. at 18.)

In response, the plaintiff has cited evidence suggesting that: 1) there were no oral or written sales objectives at Town & Country in 1996; 2) Laskaris claimed that he was not concerned with the number of cars sold by the plaintiff from the time Laskaris became Vice President on June 13, 1996, until the plaintiff's termination on June 26, 1996; and 3) the dealership's sales performance figures played no part in Laskaris's decision to terminate the plaintiff, and the only basis for his decision to terminate McKay was his subjective opinion that McKay's "effort" was not sufficient. (See Pl.'s Br. at 37; Def.'s Addendum of Exhibits, filing 49, Ex. E, Laskaris Dep. at 70:20-71:6; 75:18-77:17.) The plaintiff also argues that there is no evidence that Laskaris asked other people about McKay's performance, and points out that Laskaris was unable to provide any examples of customers complaining about their experience at Town & Country. (See Pl.'s "Additional Facts - 56.1(b)(3)(b)," filing 147, ¶¶ 185-191.) In addition, the plaintiff claims that there is a genuine issue whether Laskaris was "the sole decision-maker on McKay's termination." (Pl.'s Br. at 54.) There is evidence suggesting that Cohen and Laskaris discussed McKay's termination before the termination took place, and that

Cohen was the one who first raised the issue of McKay's termination. (See Pl.'s Addendum of Exhibits, filing 59, Ex. 12, Novak Dep. at 54:13-56:19; 177:15-18.) "Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1459 (7th Cir. 1994) (discussing plaintiff's prima facie case of retaliation). Given the plaintiff's evidence that Cohen exhibited animosity towards the plaintiff when the latter revealed his alcoholism (see Pl.'s Addendum of Exhibits, filing 148, Ex A., McKay Dep. at 192:7-15), it seems to me that the plaintiff has come forward with evidence of a genuine issue whether this animosity, as opposed to legitimate noninvidious performance criticism, was the real reason behind the plaintiff's termination. See Rizzo v. Sheahan, 266 F.3d at 715.

The plaintiff also argues that Laskaris's "claims of poor performance are completely subjective" (Pl.'s Br. at 56) and that he has come forward with evidence that "Plaintiff was doing all of the things that Laskaris wanted." (Pl.'s Br. at 57.) Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1460-61 (7th Cir. 1994), is particularly instructive on this point:

> In response to Dey's prima facie case, Colt articulates a legitimate, non-discriminatory reason for Dey's discharge--that Dey was uncooperative in the office, that a number of Colt employees had complained about her, and that her job performance on the whole was unsatisfactory. Dey counters that she was performing her duties adequately, but Colt is correct that such evidence generally is insufficient to raise a question of fact about an employer's honest assessment of inadequate performance. Our cases also give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance. Such evidence, we have explained, does not shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of our inquiry in these cases.

> But Dey's evidence goes beyond general assertions of adequate job performance to directly address the specific performance deficiencies identified by Colt. Although general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or co-workers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies. A detailed refutation of events which underlie the employer's negative performance assessment demonstrates that the employer may not have honestly relied on the identified deficiencies in making its decision. The plaintiff could thereby create a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination.

Dey v. Colt Constr. & Dev. Co., 28 F.3d at 1460-61 (citations omitted). Here, as in Dey, the

plaintiff has come forward with specific evidence from individuals who claim that McKay was not seen daydreaming on the floor or ignoring customers, and that he had a positive enthusiastic attitude and helped salesmen close deals. (Compare Pl.'s Statement of Material Facts Pursuant to Local Rule 12(N), Response to Def.'s 12 (M) Statement (12(N)(I) [sic], filing 63, ¶¶ 25, 27(c), 32 with Def.'s Addendum of Exhibits, filing 49, Ex. E, Laskaris Dep. at 53:13-54:3; 69:10-70:7.) It seems to me that the plaintiff has raised a genuine issue whether the reasons for his negative evaluations and termination proffered by the defendant are true. See Rizzo v. Sheahan, 266 F.3d at 715.

The plaintiff has come forward with evidence supporting a prima facie case of retaliation using the McDonnell Douglas framework outlined in Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 644 (7th Cir. 2002). In addition, he has provided sufficient evidence that the defendant's proffered reasons for its adverse employment actions were pretextual. Therefore, the plaintiff's retaliation claim must proceed to trial. However, the plaintiff's case will be limited to the two protected expressions (i.e., complaints to Cohen on June 3, 1996, and Laskaris on or about June 13, 1996, concerning the loss of the plaintiff's demonstration vehicle) and the three adverse employment actions (i.e., the loss of the demonstration vehicle, termination and negative performance evaluations that allegedly led to the termination, and the loss of pay for absences) that the plaintiff has supported with evidence.

In closing, I note that the defendant has argued that the plaintiff failed to claim retaliation in his charge of discrimination. (See Def.'s Supplemental Addendum of Exhibits, filing 78, Ex. DD.) It is undisputed that the charge does not mention retaliation explicitly, state allegations "like or reasonably related" to retaliation, or state allegations from which a claim of retaliation could "grow[] out of." Babrocky v. Jewel Food Co., 773 F.2d 857, 864 (7th Cir. 1985) (quoting Jenkins v. Blue Cross Mutual Hospital Insurance, Inc., 538 F.2d 164, 167 (7th Cir. 1976) (en banc)). However, the plaintiff's failure to exhaust administrative remedies is not a jurisdictional flaw. See Gibson v. West, 201 F.3d 990, 993-94 (7th Cir. 2000). This means that if the defendant did not raise as an affirmative defense the plaintiff's waiver of his retaliation claim, the defendant has waived its argument that the plaintiff's failure to exhaust his administrative remedies bars his claim. See, e.g., Pafford v. Herman, 148 F.3d 658, 670 (7th Cir. 1998); Venters v. City of Delphi, 123 F.3d 956, 968-69 (7th Cir. 1997). In this case, the defendant did include an affirmative defense entitled, "Second Affirmative Defense as to Counts I and II: Failure to Exhaust Administrative Remedies." (Answer, filing 16, at 6.) The defense refers to the plaintiff's right-to-sue letter, but does not mention his charge of discrimination. (See id. at 6-7.) More importantly, the defendant agreed to voluntarily dismiss its "Second Affirmative Defense" more than two years ago in exchange for the plaintiff's voluntary dismissal of his cause of action under the ADEA. (See Pl.'s Addendum of Exhibits, filing 148, Ex Z., Letter Dated July 22, 1999. See also filings 103-104.) To allow the defendant to reassert its defense at this time would be unjust, since the plaintiff has abandoned his ADEA claims pursuant to this agreement.

The defendant claims that it was "surprised" by the plaintiff's retaliation claim because it was not aware that the plaintiff was asserting such a claim until the plaintiff submitted its

response to the defendant's original motion for summary judgment, filing 62. (See Def.'s Reply Br. at 45-46.) However, the retaliation claim was adequately pled in the plaintiff's complaint, which was filed on March 26, 1997. (See Compl., filing 1. See also Mem. and Order on Pl.'s Mot. to Amend J., filing 125.) If the defendant is surprised by the retaliation claim, this can only be due to the defendant's own failure to carefully read the complaint. In addition, the defendant did not assert its "failure to exhaust" defense until it submitted its reply brief in support of its original motion for summary judgment. (See Town & Country's Reply in Supp. of Its Mot. for Summ. J., filing 80, at 32-33.) This deprived the plaintiff of an opportunity to respond to that argument at that time. See Venters v. City of Delphi, 123 F.3d 956, 968 (7th Cir. 1997). It is true that the plaintiff has since had an opportunity to respond to the defense. Nevertheless, given the tardiness of the invocation of the affirmative defense, the extensive discovery and briefing that has occurred, and the fact that the defendant previously voluntarily dismissed its affirmative defense in exchange for the plaintiff's dismissal of Count I of his complaint, I find that the defense of failure to exhaust administrative remedies has been waived by the defendant.

**IT IS ORDERED** that Town & Country Cadillac, Inc.'s Motion for Summary Judgment on Plaintiff's Retaliation Claim, filing 128, is granted in part. The plaintiff's claim of retaliation in violation of the Americans with Disabilities Act shall be limited to the two protected expressions and the three adverse employment actions designated in the memorandum accompanying this order. Furthermore, the plaintiff has come forward with no direct evidence of retaliation in violation of the ADA. In all other respects, the defendant's motion is denied.

Dated April _23_, 2002.

BY THE COURT

Warren K. Urbom
United States Senior District Judge